**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BENJAMIN SHELTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:26cv00213 |
| | § | |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| Defendant. | § | |

## AMENDED COMPLAINT

NOW COMES Plaintiff, BENJAMIN SHELTON, by Christopher A. Koester of Taylor Law Offices, P.C., his attorney, and for his Amended Complaint, states:

1. The Plaintiff is an insured under a long-term disability policy provided by the Defendant. See Policy attached hereto as Exhibit A.

2. The Defendant was incorporated in Indiana and is licensed to conduct business in Illinois.

3. On March 26, 2019, Plaintiff became disabled and commenced receiving long-term benefits pursuant to the terms of his policy.

4. On September 2, 2021, the Defendant wrongfully terminated Plaintiff's long-term disability benefits based upon Plaintiff's purported ability to "work as a surveillance system monitor." Defendant utilized obsolete data from 1991 to make its unilateral determination that Plaintiff was physically able to work as a surveillance system monitor. See report of Linda L. Jones, Senior Vocational Economic Analysis, attached hereto and incorporated by reference as Exhibit B.

5. On February 15, 2022, Plaintiff appealed the decision to terminate benefits.

6. On December 19, 2022, Plaintiff received a letter from the Social Security Administration confirming that he was disabled and was awarded a lump-sum check for benefits from June 2021 through September 2022.

7. On December 21, 2022, Defendant notified Plaintiff that he was required to repay Defendant for benefits received from June 2021 through September 2022.

8. On February 21, 2023, Defendant notified Plaintiff that they intended to "apply Plaintiff's disability benefit to the overpayment until the balance of $15,468.13 is paid in full."

9. On June 27, 2023, Defendant requested medical information from Plaintiff which supported Plaintiff's disability claim.

10. On August 3, 2023, Plaintiff provided Defendant with the requested information regarding his medical condition.

11. On November 28, 2023, Defendant again denied payment of long-term benefits to Plaintiff. That decision was appealed on December 1, 2023.

12. On March 4, 2024, Defendant provided Plaintiff with an IME report from Dr. Charles Brock which confirmed that Plaintiff was disabled under the policy in question.

13. On March 14, 2024, Plaintiff requested immediate reinstatement of benefits retroactive to the initial date of termination of benefits.

14. On March 18, 2025, Defendant notified Plaintiff that, notwithstanding his confirmed disabilities as outlined by Social Security and Defendant's own IME, Plaintiff was again being denied benefits because he could obtain employment as a "surveillance system monitor."

15. On June 18, 2024, Plaintiff provided Defendant with the report from Linda L. Jones, MRC, MBA, MPA, Senior Vocational-Economic Analyst. Ms. Jones opined that Plaintiff was disabled under the terms of the policy and that the purported occupation of "surveillance system monitor" has been obsolete since 1991.

16. Pursuant to the terms of the policy, Defendant is required to pay long-term disability benefits to the Plaintiff. Defendant has breached its contractual obligation to pay said benefits based upon the pretextual conclusion that Plaintiff is able to work in the current labor market as a surveillance system monitor.

WHEREFORE, Plaintiff, Benjamin Shelton, prays that this Court entered judgment in his favor and against the Defendant, Lincoln Financial Group, in an amount necessary to compensate him for his loss of benefits, penalties and all other remedies allowed under the Employee Retirement Income Security Act of 1974, including but not limited to all benefits due to him under the terms of his Plan, to enforce his rights under the terms of the Plan and/or to clarify his rights to future benefits under the terms of the Plan pursuant to 29 U.S.C. Sec. 1132 (a)(i)(B).

DATED: June 22, 2026

Benjamin, Shelton, Plaintiff

By: /s/ *Christopher A. Koester*
Christopher A. Koester
Taylor Law Offices, P.C.
122 E. Washington Avenue
Effingham, IL 62401
Ph: 217-342-3925
koester@taylorlaw.net

## CERTIFICATE OF SERVICE

The undersigned, hereby certifies that on the 22nd day of June, 2026, a true and correct copy of the foregoing was electronically filed with the Court using the CM/ECF system to be served by operation of the Court's electronic filing system on all counsel of record.

*/s/ Christopher A. Koester*

Liberty Mutual.
INSURANCE

Liberty Life Assurance Company of Boston

# GROUP DISABILITY INCOME POLICY

**Sponsor:** **Quad/Graphics, Inc**

**Policy Number:** **GF3-840-444752-01**

**Effective Date:** **June 1, 2016**

**Governing Jurisdiction** is **Wisconsin** and subject to the laws of that State.

**Premiums** are due and payable monthly on the first day of each month.

**Policy Anniversaries** shall occur each June 1st beginning in 2017.

Liberty Life Assurance Company of Boston (hereinafter referred to as Liberty) agrees to pay benefits provided by this policy in accordance with its provisions. This policy provides Long Term Disability coverage.

**PLEASE READ THIS POLICY CAREFULLY FOR FULL DETAILS.**

This policy is a legal contract and is issued in consideration of the Application of the Sponsor, a copy of which is attached, and of the payment of premiums by the Sponsor.

For purposes of this policy, the Sponsor acts on its own behalf or as the Covered Person's agent. Under no circumstances will the Sponsor be deemed the agent of Liberty.

This policy is delivered in and governed by the laws of the governing jurisdiction and to the extent applicable by The Employee Retirement Income Security Act of 1974 (ERISA) and any subsequent amendments.

The following pages including any amendments, riders or endorsements are a part of this policy.

Signed at Liberty's Home Office, 175 Berkeley Street, Boston, Massachusetts, 02116

SECRETARY

PRESIDENT

**NON-PARTICIPATING**

**FORM ADOP**

**EXHIBIT A**

<u>**TABLE OF CONTENTS**</u>

**SECTION 1**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **SCHEDULE OF BENEFITS**

**SECTION 2**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DEFINITIONS**

**SECTION 3**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **ELIGIBILITY AND EFFECTIVE DATES**

**SECTION 4**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DISABILITY INCOME BENEFITS**

**SECTION 5**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **EXCLUSIONS**

**SECTION 6**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TERMINATION PROVISIONS**

**SECTION 7**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **GENERAL PROVISIONS**

**SECTION 8**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **PREMIUMS**

**SECTION 9**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **APPLICATION**

# SECTION 1 - SCHEDULE OF BENEFITS

## ELIGIBILITY REQUIREMENTS FOR INSURANCE BENEFITS

**Minimum Hourly Requirement:**

Employees who work a regular schedule each week as determined by the Sponsor

**Long Term Disability Benefits:**

Class 1: All active, full-time and part-time management Employees excluding Atglen union, Waukee union and Hazelton union Employees

Class 2: All active, full-time and part-time non-management Employees excluding Atglen union, Waukee union and Hazelton union Employees

Class 3: All active, full-time and part-time Atglen union Employees subject to a collective bargaining unit

Class 4: All active, full-time and part-time Waukee union Employees subject to a collective bargaining agreement

Class 5: All active, full-time and part-time Hazleton union Employees subject to a collective bargaining agreement

**Note:** This policy does not cover the following Employees: Temporary and seasonal Employees, and Employees who are not legal residents working in the United States.

**Eligibility Waiting Period:**

Applicable to Class 1, 2, 3

1. If the Covered Person is employed by the Sponsor on the policy effective date - 60 days of continuous, Active Employment

2. If the Covered Person begins employment for the Sponsor after the policy effective date - 60 days of continuous, Active Employment

   Note: Prior Service Credit will be applied to the Eligibility Waiting Period for an Employee who is reinstated in less than 60 days following a reduction in force.

Applicable to Class 4

1. If the Covered Person is employed by the Sponsor on the policy effective date - First of the month following 450 hours of continuous, Active Employment

2. If the Covered Person begins employment for the Sponsor after the policy effective date - First of the month following 450 hours of continuous, Active Employment

   Note: Prior Service Credit will be applied to the Eligibility Waiting Period for an Employee who is reinstated in less than 60 days following a reduction in force.

Applicable to Class 5

1. If the Covered Person is employed by the Sponsor on the policy effective date - first of the month following 90 days of continuous, Active Employment

2. If the Covered Person begins employment for the Sponsor after the policy effective date - first of the month following 90 days of continuous, Active Employment

   Note: Prior Service Credit will be applied to the Eligibility Waiting Period for an Employee who is reinstated in less than 60 days following a reduction in force.

**Employee Contributions Required:**

Applicable to Class 1, 2, 4, 5

Yes

Applicable to Class 3

No

## SECTION 1 - SCHEDULE OF BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE**

**Elimination Period:**

Applicable to Class 1, 2, 4, 5:

90 days

Applicable to Class 3:

180 days

**Amount of Insurance:**

Applicable to Class 1, 2, 4, 5:

60.00% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $7,500.00 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

Applicable to Class 3:

60.00% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $10,000.00 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

**Maximum Basic Monthly Earnings on which the Benefit is Based:**

| | |
|---|---|
| Applicable to Class 1, 2, 4, 5: | $12,500.00 |
| Applicable to Class 3: | $16,667.00 |

**Own Job Duration:**

Applicable to Class 1:

36 Month Own Job

Applicable to Class 2, 4, 5:

24 Month Own Job

Applicable to Class 3:

12 Month Own Job

**LONG TERM DISABILITY COVERAGE** (Continued)

**Minimum Monthly Benefit:**

The Minimum Monthly Benefit is $50.00 or 15.00% of the Covered Person's Gross Monthly Benefit, whichever is greater.

**Maximum Benefit Period:**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | Greater of SSNRA* or to age 65 (but not less than 5 years) |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and over | 12 months |

* SSNRA means the Social Security Normal Retirement Age as figured by the 1983 amendment to the Social Security Act and any subsequent amendments and provides:

| Year of Birth | Normal Retirement Age |
|---|---|
| Before 1938 | 65 |
| 1938 | 65 and 2 months |
| 1939 | 65 and 4 months |
| 1940 | 65 and 6 months |
| 1941 | 65 and 8 months |
| 1942 | 65 and 10 months |
| 1943-1954 | 66 |
| 1955 | 66 and 2 months |
| 1956 | 66 and 4 months |
| 1957 | 66 and 6 months |
| 1958 | 66 and 8 months |
| 1959 | 66 and 10 months |
| 1960 and after | 67 |

# SECTION 2 - DEFINITIONS

In this section Liberty defines some basic terms needed to understand this policy. The male pronoun whenever used in this policy includes the female.

**"Active Employment"** means the Employee must be actively at work for the Sponsor:

1. on a full-time or part-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

   a. at the Sponsor's usual place of business; or
   b. at a location to which the Sponsor's business requires the Employee to travel.

An Employee will be considered actively at work if he was actually at work on the day immediately preceding:

1. a weekend (except where one or both of these days are scheduled work days);
2. holidays (except when the holiday is a scheduled work day);
3. paid vacations;
4. any non-scheduled work day;
5. an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off); and
6. an emergency leave of absence (except emergency medical leave for the Covered Person's own disabling condition).

**"Administrative Office"** means Liberty Life Assurance Company of Boston, 9 Riverside Road, Weston, MA 02493.

**"Annual Enrollment Period"** or **"Enrollment Period"** means the period before each policy anniversary so designated by the Sponsor and Liberty during which an Employee may enroll for coverage under this policy.

## SECTION 2 - DEFINITIONS
(Continued)

**"Any Job"** means any job that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.

**"Application"** is the document designated in Section 9; it is attached to and is made a part of this policy.

**"Appropriate Available Treatment"** means care or services which are:

1. generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;
2. accessible within the Covered Person's geographical region;
3. provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;
4. in accordance with generally accepted medical standards of practice.

**"Basic Monthly Earnings"** means the Covered Person's monthly rate of earnings from the Sponsor in effect immediately prior to the date Disability or Partial Disability begins. However, such earnings will not include bonuses, commissions, overtime pay and extra compensation.

**"Consumer Price Index"** means the government publication "The Consumer Price Index for Urban Wage Earners and Clerical Workers" provided monthly by the U.S. Department of Labor, or its successor or in the event of no successor a similar Index of comparable purpose chosen by Liberty.

**"Covered Person"** means an Employee insured under this policy.

**"Disability"** or **"Disabled"** means:

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

Applicable to Class 1:

a. i. if the Covered Person is eligible for the 36 Month Own Job benefit, **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 36 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job; and

ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Job.

Applicable to Class 2, 4, 5:

a. i. if the Covered Person is eligible for the 24 Month Own Job benefit, **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job; and

ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Job.

Applicable to Class 3:

a. i. if the Covered Person is eligible for the 12 Month Own Job benefit, **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job; and

ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Job.

2. With respect to Covered Persons employed as pilots, co-pilots and crewmembers of an aircraft:

**"Disability"** or **"Disabled"** means as a result of Injury or Sickness the Covered Person is unable to perform the Material and Substantial Duties of Any Job.

**"Disability Benefits under a Retirement Plan"** means money which:

1. is payable under a Retirement Plan due to Disability as defined in that plan; and
2. does not reduce the amount of money which would have been paid as retirement benefits at the normal retirement age under the plan if the Disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this policy.)

## SECTION 2 - DEFINITIONS
(Continued)

**"Domestic Partner"** means an unmarried person of the same or opposite sex with whom the Covered Person shares a committed relationship, are jointly responsible for each other's welfare and financial obligations, at least 18 years of age and mentally competent to consent to a contract, not related by blood to a degree that could prohibit legal marriage in the state where they legally reside, maintain the same residence(s) and are not married to or legally separated from anyone else. A Domestic Partner certification must be completed and filed with the Sponsor before the partner can be designated as an Eligible Survivor.

**"Eligibility Date"** means the date an Employee becomes eligible for insurance under this policy. Eligibility Requirements are shown in the Schedule of Benefits.

**"Eligible Survivor"** means the Covered Person's spouse or Domestic Partner, if living, otherwise the Covered Person's children under age 26.

**"Eligibility Waiting Period"** means the continuous length of time an Employee must be in Active Employment in an eligible class to reach his Eligibility Date.

**"Elimination Period"** means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.

If the Covered Person returns to work for any forty five or fewer days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled or Partially Disabled to satisfy the Elimination Period.

**"Employee"** means a person in Active Employment with the Sponsor.

**"Enrollment Form"** is the document completed by the Covered Person, if required, when enrolling for coverage. This form must be satisfactory to Liberty.

**"Evidence of Insurability"** means a statement of proof of an Employee's medical history upon which acceptance for insurance will be determined by Liberty.

## SECTION 2 - DEFINITIONS
(Continued)

**"Extended Treatment Plan"** means continued care that is consistent with the American Psychiatric Association's standard principles of Treatment, and is in lieu of confinement in a Hospital or Institution. It must be approved in writing by a Physician.

**"Family and Medical Leave"** means a leave of absence for the birth, adoption or foster care of a child, or for the care of the Covered Person's child, spouse or parent or for the Covered Person's own serious health condition as those terms are defined by the Federal Family and Medical Leave Act of 1993 (FMLA) and any amendments, or by applicable state law.

Applicable to Class 1, 2, 4, 5:

**"Family Status Change"** means any one of the following events that may occur:

1. the Employee's marriage or divorce;
2. the Employee's filing or rescinding of a Domestic Partner certification;
3. the birth of a child to the Employee;
4. the adoption of a child by the Employee;
5. the death of the Employee's spouse or Domestic Partner or child;
6. the commencement or termination of employment of the Employee's spouse or Domestic Partner;
7. the change from part-time employment to full-time employment by the Employee or the Employee's spouse or Domestic Partner;
8. the change from full-time employment to part-time employment by the Employee or the Employee's spouse or Domestic Partner;
9. the taking of unpaid leave of absence by the Employee or the Employee's spouse or Domestic Partner.

**"Gross Monthly Benefit"** means the Covered Person's Monthly Benefit before any reduction for Other Income Benefits and Other Income Earnings.

**"Hospital"** or **"Institution"** means a facility licensed to provide Treatment for the condition causing the Covered Person's Disability.

**"Indexed Basic Monthly Earnings"** means the Covered Person's Basic Monthly Earnings in effect just prior to the date Disability or Partial Disability began adjusted on the first anniversary of benefit payments and each anniversary thereafter.

**"Initial Enrollment Period"** means one of the following periods during which an Employee may first enroll for coverage under this policy:

1. for an Employee who is eligible for insurance on the policy effective date, a period before the policy effective date set by the Sponsor and Liberty.

2. for an Employee who becomes eligible for insurance after the policy effective date, the period which ends 31 days after his Eligibility Date.

**"Injury"** means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this policy:

1. any Disability which begins more than 60 days after an Injury will be considered a Sickness; and

2. any Injury which occurs before the Covered Person is covered under this policy, but which accounts for a medical condition that arises while the Covered Person is covered under this policy will be treated as a Sickness.

**"Last Monthly Benefit"** means the net Monthly Benefit payable to the Covered Person prior to his death.

**"Material and Substantial Duties"** means responsibilities that are normally required to perform the Covered Person's Own Job, or any other job, and cannot be reasonably eliminated or modified.

**"Mental Illness"** means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness. If the DSM is discontinued, Liberty will use the replacement chosen or published by the American Psychiatric Association.

**"Monthly Benefit"** means the monthly amount payable by Liberty to the Disabled or Partially Disabled Covered Person.

**"Own Job"** means the Covered Person's job that he was performing when his Disability or Partial Disability began.

**"Partial Disability" or "Partially Disabled"** means the Covered Person, as a result of Injury or Sickness, is able to:

1. perform one or more, but not all, of the Material and Substantial Duties of his Own Job or Any Job on an Active Employment or a part-time basis; or

2. perform all of the Material and Substantial Duties of his Own Job or Any Job on a part-time basis; and

3. earn between 20.00% and 80.00% of his Basic Monthly Earnings.

**"Physician"** means a person who:

1. is licensed to practice medicine and is practicing within the terms of his license; or

2. is a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the state where the Treatment is received and is practicing within the terms of his license.

It does not include a Covered Person, any family member or domestic partner.

**"Proof"** means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Liberty.

**"Regular Attendance"** means the Covered Person's personal visits to a Physician which are medically necessary according to generally accepted medical standards to effectively manage and treat the Covered Person's Disability or Partial Disability.

**"Retirement Benefit under a Retirement Plan"** means money which:

1. is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

2. does not represent contributions made by an Employee (payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received); and

3. is payable upon:

   a. early or normal retirement; or
   b. Disability, if the payment does reduce the amount of money which would have been paid under the plan at the normal retirement age.

## SECTION 2 - DEFINITIONS
(Continued)

**"Retirement Plan"** means a plan which provides retirement benefits to Employees and which is not funded wholly by Employee contributions. The term shall not include a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, stock ownership plan, 401(K) or a non-qualified plan of deferred compensation.

**"Schedule of Benefits"** means the section of this policy which shows, among other things, the Eligibility Requirements, Eligibility Waiting Period, Elimination Period, Amount of Insurance, Minimum Benefit, and Maximum Benefit Period.

**"Sickness"** means illness, disease, pregnancy or complications of pregnancy.

**"Sponsor"** means the entity to whom this policy is issued.

**"Sponsor's Retirement Plan"** is deemed to include any Retirement Plan:

1. which is part of any Federal, State, Municipal or Association retirement system; or

2. for which the Employee is eligible as a result of employment with the Sponsor.

**"Substance Abuse"** means alcohol and/or drug abuse, addiction or dependency.

**"Treatment"** means consulting, receiving care or services provided by or under the direction of a Physician including diagnostic measures, being prescribed drugs and/or medicines, whether the Covered Person chooses to take them or not, and taking drugs and/or medicines.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES

**Applicable to Long Term Disability Class 3:**

**Eligibility Requirements for Insurance Benefits**

The eligibility requirements for insurance benefits are shown in the Schedule of Benefits.

**Eligibility Date for Insurance Benefits**

An Employee in an eligible class will qualify for insurance on the later of:

1. this policy's effective date; or
2. the day after the Employee completes the Eligibility Waiting Period shown in the Schedule of Benefits.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Applicable to Long Term Disability Class 3:**

**Effective Date of Insurance**

Insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if the Employee's application or enrollment for insurance is made with Liberty through the Sponsor in a form or format satisfactory to Liberty.

An Employee will be insured on his Eligibility Date.

**Delayed Effective Date for Insurance**

The effective date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will begin on the date the individual returns to Active Employment.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES

**Applicable to Long Term Disability Class 1, 2, 4, 5:**

**Eligibility Requirements for Insurance Benefits**

The eligibility requirements for insurance benefits are shown in the Schedule of Benefits.

**Eligibility Date for Insurance Benefits**

An Employee in an eligible class will qualify for insurance on the later of:

1. this policy's effective date; or
2. the day after the Employee completes the Eligibility Waiting Period shown in the Schedule of Benefits.

**Initial Enrollment Period**

During the Initial Enrollment Period an Employee can enroll in any one coverage or coverage option shown in the Schedule of Benefits. If he does not choose any coverage or coverage option, he will not be enrolled for any coverage. If an Employee's Initial Enrollment Period takes place during or after the Annual Enrollment Period, but before the policy anniversary his coverage option will apply for (a) the rest of the policy year in which he first becomes eligible; and (b) the next policy year.

**Annual Enrollment Period**

During each Annual Enrollment Period, a Covered Person may keep his coverage at the same level or make one of the following changes in coverage for the next policy year:

1. a decrease in coverage;
2. an increase in coverage subject to Evidence of Insurability and the Pre-Existing Condition Exclusion defined herein.

**Applicable to Long Term Disability Class 1, 2, 4, 5:**

**Family Status Change**

When an Employee experiences a Family Status Change, he may keep his coverage at the same level or make one of the following changes in coverage:

1. a decrease in coverage;

2. an increase in coverage subject to Evidence of Insurability and the Pre-Existing Condition Exclusion defined herein.

The Covered Person must apply for the change in coverage within 31 Days of the date of the Family Status Change. Such changes in coverage must be due to or consistent with the reason that the change in coverage was permitted. A change in coverage is consistent with a Family Status Change only if it is necessary or appropriate as the result of the Family Status Change.

**Effective Date of Insurance**

Insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if the Employee's application or enrollment for insurance is made with Liberty through the Sponsor in a form or format satisfactory to Liberty.

1. For Coverage Applied for During Initial Enrollment Periods:

   a. an Employee will be insured on the date the Employee makes application for insurance if he enrolls on or before the 31st day after his Eligibility Date; or
   b. an Employee who does not enroll on or before the 31st day after his Eligibility Date, or terminated his insurance while continuing to be eligible must submit an application and Evidence of Insurability to Liberty for approval, at the Employee's expense. The Employee will be insured on the date Liberty gives its approval.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Applicable to Long Term Disability Class 1, 2, 4, 5:**

**Effective Date of Insurance** (Continued)

2. For Contributory Coverage Applied for During Annual Enrollment Periods

   An Employee will be insured for the selected contributory coverage on the later of these dates:

   a. the first day of the next policy anniversary; or
   b. the date Liberty gives its approval, if the Employee:

      i. increases his coverage option; or
      ii. terminated his insurance while continuing to be eligible.

   In the case of i. and ii. above, the Employee must submit an application and Evidence of Insurability to Liberty for approval. This will be at the Employee's expense.

3. For Coverage Applied for Due to a Family Status Change

   An Employee will be insured for the selected coverage on the later of the following dates, provided he applies or enrolls for the change in coverage before the end of the 31st Day following the Family Status Change:

   a. the date of the Family Status Change;
   b. the date the Employee applies or enrolls for the change in coverage; or
   c. the date Liberty gives its approval, if the Employee:

      i. increases his coverage option; or
      ii terminated his insurance while continuing to be eligible.

   In the case of i. and ii. above, the Employee must submit an application and Evidence of Insurability to Liberty for approval. This will be at the Employee's expense.

**Delayed Effective Date for Insurance**

The effective date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will begin on the date the individual returns to Active Employment.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Family and Medical Leave**

An Employee's coverage may be continued under this policy for an approved family or medical leave of absence for up to 12 weeks following the date coverage would have terminated, subject to the following:

1. the authorized leave is in writing;

2. the required premium is paid;

3. the Covered Person's benefit level, or the amount of earnings upon which the Covered Person's benefit may be based, will be that in effect on the date before said leave begins; and

4. continuation of coverage will cease immediately if any one of the following events should occur:

   a. the Covered Person returns to work;
   b. this group insurance policy terminates;
   c. the Covered Person is no longer in an eligible class;
   d. nonpayment of premium when due by the Sponsor or the Covered Person;
   e. the Covered Person's employment terminates.

**Rehire Terms**

If a former Employee is re-hired by the Sponsor within 60 days of his termination date, all past periods of Active Employment with the Sponsor will be used in determining the re-hired Employee's Eligibility Date. If a former Employee is re-hired by the Sponsor more than 60 days after his termination date, he is considered to be a new Employee when determining his Eligibility Date.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Leave of Absence**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is given a leave of absence

The Covered Person's coverage will not continue beyond a period of up to thirty-four weeks. In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

**Lay-off**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is temporarily laid off

The Covered Person's coverage will not continue beyond a period of six months. In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Transfer Provision**

In order to prevent loss of coverage for an individual because of transfer of insurance carriers, this policy will provide coverage for certain individuals as follows:

**Failure to be In Active Employment Due to Injury or Sickness:**

Subject to premium payments, this policy will cover individuals who:

1. at the time of transfer are covered under the prior carrier's policy; and
2. are not in Active Employment due to Injury or Sickness on the effective date of this policy.

Benefits will be determined based on the lesser of:

1. the amount of the Disability benefit that would have been payable under the prior policy and subject to any applicable policy limitations; or
2. the amount of Disability benefits payable under this policy. If benefits are payable under the prior policy for the Disability, no benefits are payable under this policy.

**Disability Due to a Pre-Existing Condition**

If an individual was insured under the prior carrier's policy at the time of transfer and was in Active Employment and insured under this policy on its effective date, benefits may be payable for a Disability due to a Pre-Existing Condition.

If the individual can satisfy this policy's Pre-Existing Condition Exclusion, the benefit will be determined according to this policy.

If the individual cannot satisfy this policy's Pre-Existing Condition Exclusion, then:

1. Liberty will apply the Pre-Existing Condition Exclusion of the prior carrier's policy and;
2. if the individual would have satisfied the prior carrier's pre-existing condition exclusion, giving consideration towards continuous time coverage under this policy; and the prior carrier's policy, the benefit will be determined according to this policy. However, the Maximum Monthly Benefit amount payable under this policy shall not exceed the maximum monthly benefit payable under the prior carrier's policy.

No benefit will be paid if the individual cannot satisfy the Pre-Existing Condition Exclusions of either policy.

# SECTION 4 - DISABILITY INCOME BENEFITS

## LONG TERM DISABILITY COVERAGE

### Disability Benefit

When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:

1. Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Disability, the Injury must occur and Disability must begin while the Employee is insured for this coverage.

The Monthly Benefit will not:

1. exceed the Covered Person's Amount of Insurance; or
2. be paid for longer than the Maximum Benefit Period.

The Amount of Insurance and the Maximum Benefit Period are shown in the Schedule of Benefits.

### Amount of Disability Monthly Benefit

To figure the amount of Monthly Benefit:

1. Take the lesser of:
   a. the Covered Person's Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits; or
   b. the Maximum Monthly Benefit shown in the Schedule of Benefits; and then
2. Deduct Other Income Benefits and Other Income Earnings, (shown in the Other Income Benefits and Other Income Earnings provision of this policy), from this amount.

The Monthly Benefit payable will not be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. However, if an overpayment is due to Liberty, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability**

When Liberty receives Proof that a Covered Person is Partially Disabled and has experienced a loss of earnings due to Injury or Sickness and requires the Regular Attendance of a Physician, he may be eligible to receive a Monthly Benefit, subject to any other provisions of this policy. To be eligible to receive Partial Disability benefits, the Covered Person may be employed in his Own Job or another job, must satisfy the Elimination Period and must be earning between 20.00% and 80.00% of his Basic Monthly Earnings.

A Monthly Benefit will be paid for the period of Partial Disability if the Covered Person gives to Liberty Proof of continued:

1. Partial Disability;

2. Regular Attendance of a Physician; and

3. Appropriate Available Treatment.

The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Partially Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Partial Disability, the Injury must occur and Partial Disability must begin while the Employee is insured for this coverage.

**Proportionate Loss Monthly Calculation with Work Incentive Benefit**

For the first 24 Months, the work incentive benefit will be an amount equal to the Covered Person's Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits, without any reductions from earnings. The work incentive benefit will only be reduced, if the Monthly Benefit payable plus any earnings exceed 100% of the Covered Person's Basic Monthly Earnings. If the combined total is more, the Monthly Benefit will be reduced by the excess amount so that the Monthly Benefit plus the Covered Person's earnings does not exceed 100% of his Basic Monthly Earnings.

Thereafter, to figure the Amount of Monthly Benefit the formula (A divided by B) x C will be used.

A = The Covered Person's Basic Monthly Earnings minus the Covered Person's earnings received while he is Partially Disabled. This figure represents the amount of lost earnings.

B = The Covered Person's Basic Monthly Earnings.

C = The Monthly Benefit as figured in the Disability provision of this policy plus the Covered Person's earnings received while he is Partially Disabled, (but, not including adjustments under the Cost of Living Adjustment Benefit, if included).

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability** (Continued)

**Proportionate Loss Monthly Calculation with Work Incentive Benefit** (Continued)

On the first anniversary of benefit payments and each anniversary thereafter, for the purpose of calculating the benefit, the term "Basic Monthly Earnings" is:

1. replaced by "Indexed Basic Monthly Earnings"; and
2. increased annually by 7.00%, or the current annual percentage increase in the Consumer Price Index, whichever is less.

The Monthly Benefit payable will not be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. However, if an overpayment is due to Liberty, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Mental Illness and/or Substance Abuse Limitation**

The benefit for Disability due to Mental Illness and/or Substance Abuse will not exceed a period of 24 months of Monthly Benefit payments while the Covered Person is insured under this policy.

If the Covered Person is in a Hospital or Institution for Mental Illness and/or Substance Abuse at the end of the period of 24 months, the Monthly Benefit will be paid during the confinement.

If the Covered Person is not confined in a Hospital or Institution for Mental Illness and/or Substance Abuse, but is fully participating in an Extended Treatment Plan for the condition that caused Disability, the Monthly Benefit will be payable to a Covered Person for up to a period of 36 months.

In no event will the Monthly Benefit be payable beyond the Maximum Benefit Period shown in the Schedule of Benefits.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Rehabilitation Incentive Benefit**

Liberty will pay an increased Monthly Benefit while a Covered Person is fully participating in a Rehabilitation Program. Liberty must first approve the Rehabilitation Program in writing before a Covered Person can be considered for this benefit. If Liberty does not approve a Rehabilitation Program, the regular Disability benefit will be payable provided the Covered Person is Disabled under the terms of this policy. To be eligible for a Rehabilitation Incentive Benefit, the Covered Person must:

1. be Disabled and receiving benefits under this policy; and

2. be fully participating in a Rehabilitation Program approved by Liberty.

**Increased Monthly Benefit**

If the Covered Person is eligible for a Rehabilitation Incentive Benefit, the benefit percentage shown in the Schedule of Benefits, will be increased by 10.00%. The increased benefit will begin on the first day of the month after Liberty receives written Proof of the Covered Person's full participation in the Rehabilitation Program.

**Disability Benefits Termination**

If the Covered Person, at any time, declines to fully participate in an approved Rehabilitation Program recommended by Liberty, his Disability benefits will terminate on the first day of the month following the Covered Person's declination to fully participate in the approved Rehabilitation Program. If Liberty recommends rehabilitation, no benefit will be paid from the date recommendation is made until Liberty receives the Covered Person's written agreement to fully participate in the Rehabilitation Program.

**Discontinuation of the Rehabilitation Incentive Benefit**

The Rehabilitation Incentive Benefit will cease:

1. when the Covered Person is no longer fully participating in a Rehabilitation Program approved by Liberty;

2. in accordance with the provision[s] entitled "Discontinuation of the Long Term Disability Benefit"; or

3. when the Rehabilitation Program ends.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Rehabilitation Incentive Benefit** (Continued)

For the purpose of this provision, **"Rehabilitation Program"** means a comprehensive individually tailored, goal oriented program to return a Disabled Covered Person to gainful employment. The services offered may include, but are not limited to, the following:

1. physical therapy;
2. occupational therapy;
3. work hardening programs;
4. functional capacity evaluations;
5. psychological and vocational counseling;
6. rehabilitative employment; and
7. vocational rehabilitation services.

**Family Care Credit Benefit**

If a Covered Person is Disabled or Partially Disabled and receiving a benefit under the above-captioned policy, an additional benefit may be payable to the Covered Person for family care expenses that are incurred while the Covered Person is participating in the Rehabilitative Program as defined in the Rehabilitative Incentive Benefit provision.

Liberty will reimburse the Covered Person for family care credit expenses incurred for each qualifying child or family member, not to exceed:

1. $350 per month for the first 12 months; and $175 thereafter. In no event may the deduction exceed the Covered Person's monthly earnings; and
2. $2,500 per calendar year for all eligible family care credit expenses.

To qualify for this benefit, the Covered Person must provide satisfactory proof that:

1. family care credit expenses are being incurred for family care while participating in the Rehabilitative Program as defined in Rehabilitative Incentive Benefit provision; and
2. payments for family care have been made to a licensed caregiver who is not a member of the Covered Person's immediate family or living at the Covered Person's residence.

**Eligible Child** means the Covered Person's Dependent Child(ren) under the age of 13 who lives with the Covered Person.

**Dependent Child(ren)** means the Covered Person's unmarried children, including their own natural offspring, stepchildren, foster children or adopted children, who are primarily dependent on the Covered Person for financial support and maintenance.

Family Care Credit Benefits will end on the earlier of:

1. the date the Dependent Child(ren) attain the age of 13; and
2. the date after 24 monthly family care credit payments have been made during the Covered Person's Disability; and
3. the date a charge is no longer made by the caregiver; and
4. the date the Covered Person is no longer participating in the Rehabilitative Program as defined in the Rehabilitative Incentive Benefit provision.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Three Month Survivor Benefit**

Liberty will pay a lump sum benefit to the Eligible Survivor when Proof is received that a Covered Person died:

1. after Disability had continued for 3 or more consecutive months; and

2. while receiving a Monthly Benefit.

The lump sum benefit will be an amount equal to three times the Covered Person's Last Monthly Benefit.

If the survivor benefit is payable to the Covered Person's children, payment will be made in equal shares to the children, including step children and legally adopted children. However, if any of said children are minors or incapacitated, payment will be made on their behalf to the court appointed guardian of the children's property. This payment will be valid and effective against all claims by others representing or claiming to represent the children.

If there is no Eligible Survivor, the benefit is payable to the estate.

If an overpayment is due to Liberty at the time of a Covered Person's death, the benefit payable under this provision will be applied toward satisfying the overpayment.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Workplace Modification Benefit**

If a Covered Person is Disabled or Partially Disabled and receiving a benefit from Liberty, a benefit may be payable to the Sponsor as part of the Covered Person's benefit for modifications to the workplace to accommodate the Covered Person's return to work or to assist the Covered Person in remaining at work.

Liberty will reimburse the Sponsor for up to 100% of reasonable costs the Sponsor incurs for the modification, up to the greater of:

1. $1,000.00; or
2. the equivalent of 2 months of the Covered Person's Monthly Benefit.

To qualify for this benefit:

1. the Disability or Partial Disability must prevent the Covered Person from performing some or all of the Material and Substantial Duties of his occupation; and
2. any proposed modifications must be approved in writing and signed by the Covered Person, the Sponsor and Liberty; and
3. the Sponsor must agree to make the modifications to the workplace to reasonably accommodate the Covered Person's return to work or to assist the Covered Person in remaining at work.

The Sponsor's costs for the approved modifications will be reimbursed after:

1. the proposed modifications have been made; and
2. written proof of the expenses incurred by the Sponsor has been provided to Liberty; and
3. Liberty has received proof that the Covered Person has returned to and/or remains at work.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings**

**Other Income Benefits** means:

1. The amount for which the Covered Person is eligible under:

   a. Workers' or Workmen's Compensation Laws;
   b. Occupational Disease Law;
   c. Title 46, United States Code Section 688 (The Jones Act);
   d. any work loss provision in mandatory "No-Fault" auto insurance;
   e. Railroad Retirement Act;
   f. any governmental compulsory benefit act or law; or
   g. any other act or law of like intent.

2. The amount of any Disability benefits which the Covered Person is eligible to receive under:
   a. any other group insurance plan of the Sponsor;
   b. any governmental retirement system as a result of his employment with the Sponsor ; or
   c. any individual insurance plan where the premium is wholly or partially paid by the Sponsor. However, Liberty will only reduce the Monthly Benefit if the Covered Person's Monthly Benefit under this policy, plus any benefits that the Covered Person is eligible to receive under such individual insurance plan exceed 100% of the Covered Person's Basic Monthly Earnings. If this sum exceeds 100% of Basic Monthly Earnings, the Covered Person's Monthly Benefit under this policy will be reduced by such excess amount.

3. The amount of benefits the Covered Person receives under the Sponsor's Retirement Plan as follows:

   a. the amount of any Disability Benefits under a Retirement Plan, or Retirement Benefits under a Retirement Plan the Covered Person voluntarily elects to receive as retirement payment under the Sponsor's Retirement Plan; and
   b. the amount the Covered Person receives as retirement payments when he reaches the later of age 65, or normal retirement age as defined in the Sponsor's plan.

4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, which:

   a. the Covered Person receives or is eligible to receive; and
   b. his spouse, child or children receives or are eligible to receive because of his Disability; or
   c. his spouse, child or children receives or are eligible to receive because of his eligibility for retirement benefits.

5. Any amount the Covered Person receives from any unemployment benefits.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings** (Continued)

**Other Income Earnings** means:

1. the amount of earnings the Covered Person earns or receives from any form of employment including severance; and

2. any amount the Covered Person receives from any formal or informal sick leave or salary continuation plan(s).

Other Income Benefits, except retirement benefits, must be payable as a result of the same Disability for which Liberty pays a benefit. The sum of Other Income Benefits and Other Income Earnings will be deducted in accordance with the provisions of this policy.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Estimation of Benefits**

Liberty will reduce the Covered Person's Disability or Partial Disability benefits by the amount of Other Income Benefits that we estimate are payable to the Covered Person and his dependents.

The Covered Person's Disability benefit will not be reduced by the estimated amount of Other Income Benefits if the Covered Person:

1. provides satisfactory proof of application for Other Income Benefits;

2. signs a reimbursement agreement under which, in part, the Covered Person agrees to repay Liberty for any overpayment resulting from the award or receipt of Other Income Benefits;

3. if applicable, provides satisfactory proof that all appeals for Other Income Benefits have been made on a timely basis to the highest administrative level unless Liberty determines that further appeals are not likely to succeed; and

4. if applicable, submits satisfactory proof that Other Income Benefits have been denied at the highest administrative level unless Liberty determines that further appeals are not likely to succeed.

Liberty will not estimate or reduce for any benefits under the Sponsor's pension or retirement benefit plan according to applicable law, until the Covered Person actually receives them.

In the event that Liberty overestimates the amount payable to the Covered Person from any plans referred to in the Other Income Benefits and Other Income Earnings provision of this policy, Liberty will reimburse the Covered Person for such amount upon receipt of written proof of the amount of Other Income Benefits awarded (whether by compromise, settlement, award or judgement) or denied (after appeal through the highest administrative level).

**Social Security Assistance**

Liberty may help a Covered Person in applying for Social Security Disability Income Benefits. In order to be eligible for assistance the Covered Person must be receiving a Monthly Benefit from Liberty. Such assistance will be provided only if Liberty determines that assistance would be beneficial.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Lump Sum Payments**

Other Income Benefits from a compromise, settlement, award or judgement which are paid to the Covered Person in a lump sum and are meant to compensate the Covered Person for any one or more of the following:

1. loss of past or future wages;
2. impaired earnings capacity;
3. lessened ability to compete in the open labor market;
4. any degree of permanent impairment; and
5. any degree of loss of bodily function or capacity;

will be prorated on a monthly basis as follows:

1. over the period of time such benefits would have been paid if not in a lump sum; or

2. if such period of time cannot be determined, the lesser of:

   a. the remainder of the Maximum Benefit Period; or
   b. 5 years.

**Cost of Living Freeze**

After the first deduction for each of the Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost of living increases payable under the Other Income Benefits and Other Income Earnings provision of this policy. This provision does not apply to increases received from any form of employment.

**Prorated Benefits**

For any period for which a Long Term Disability benefit is payable that does not extend through a full month, the benefit will be paid on a prorated basis. The rate will be 1/30th for each day for such period of Disability.

**Discontinuation of the Long Term Disability Benefit**

The Monthly Benefit will cease on the earliest of:

1. the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;

2. the date the Covered Person fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Discontinuation of the Long Term Disability Benefit** (Continued)

The Monthly Benefit will cease on the earliest of: (Continued)

3. the date the Covered Person refuses to be examined or evaluated at reasonable intervals;

4. the date the Covered Person refuses to receive Appropriate Available Treatment;

5. the date the Covered Person refuses a job with the Sponsor where workplace modifications or accommodations were made to allow the Covered Person to perform the Material and Substantial Duties of the job;

6. the date the Covered Person is able to work in his Own Job on a part-time basis, but chooses not to;

7. on the first day of the month following the date the Covered Person refuses to fully participate in a Rehabilitation Program recommended by Liberty according to the individually written Rehabilitation Program;

8. the date the Covered Person's current Partial Disability earnings exceed 80.00% of his Indexed Basic Monthly Earnings;

   Because the Covered Person's current earnings may fluctuate, Liberty will average earnings over three consecutive months rather than immediately terminating his benefit once 80.00% of Indexed Basic Monthly Earnings has been exceeded.

9. the date the Covered Person is no longer Disabled according to this policy;

10. the end of the Maximum Benefit Period; or

11. the date the Covered Person dies.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Successive Periods of Disability**

With respect to this policy, **"Successive Periods of Disability"** means a Disability which is related or due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.

A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability benefits under this policy, a Covered Person:

1. returns to his Own Job on an Active Employment basis for less than six continuous months; and

2. performs all the Material and Substantial Duties of his Own Job.

To qualify for a Successive Periods of Disability benefit, the Covered Person must experience more than a 20% loss of Basic Monthly Earnings.

Benefit payments will be subject to the terms of this policy for the prior Disability.

If a Covered Person returns to his Own Job on an Active Employment basis for six continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. The Covered Person must complete another Elimination Period.

If a Covered Person becomes eligible for coverage under any other group long term disability coverage, this Successive Period of Disability provision will cease to apply to that Covered Person.

# SECTION 5 - EXCLUSIONS

## GENERAL EXCLUSIONS

This policy will not cover any Disability due to:

1. war, declared or undeclared, or any act of war;
2. intentionally self-inflicted injuries, while sane or insane;
3. active Participation in a Riot;
4. the committing of or attempting to commit a felony or misdemeanor;
5. cosmetic surgery unless such surgery is in connection with an Injury or Sickness sustained while the individual is a Covered Person; or
6. a gender change, including, but not limited to, any operation, drug therapy or any other procedure related to a gender change.

No benefit will be payable during any period of incarceration.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in defense of the Covered Person, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and fire fighters.

With respect to this provision, **Riot** shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together, whether or not acting with a common intent and whether or not damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

## SECTION 5 - EXCLUSIONS
(Continued)

**LONG TERM DISABILITY COVERAGE**

**Pre-Existing Condition Exclusion**

This policy will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from, a Pre-Existing Condition; and

2. which begins in the first 12 months immediately after the Covered Person's effective date of coverage.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage.

# SECTION 6 - TERMINATION PROVISIONS

**Termination of a Covered Person's Insurance**

A Covered Person will cease to be insured on the earliest of the following dates:

1. the date this policy terminates, but without prejudice to any claim originating prior to the time of termination;

2. the date the Covered Person is no longer in an eligible class;

3. the date the Covered Person's class is no longer included for insurance;

4. the last day for which any required Employee contribution has been made;

5. the date employment terminates. Cessation of Active Employment will be deemed termination of employment, except the insurance will be continued for an Employee absent due to Disability during:

   a. the Elimination Period; and
   b. any period during which premium is being waived.

6. the date the Covered Person ceases active work due to a labor dispute, including any strike, work slowdown, or lockout.

Liberty reserves the right to review and terminate all classes insured under this policy if any class(es) cease(s) to be covered.

## SECTION 6 - TERMINATION PROVISIONS
(Continued)

**Policy Termination**

1. Termination of this policy under any conditions will not prejudice any claim which occurs while this policy is in force.

2. If the Sponsor fails to pay any premium within the grace period, this policy will terminate at 12:00 midnight Standard Time on the last day of the grace period. The Sponsor may terminate this policy by advance written notice delivered to Liberty at least 31 days prior to the termination date. This policy will not terminate during any period for which premium has been paid. The Sponsor will be liable to Liberty for all premiums due and unpaid for the full period for which this policy is in force.

3. Liberty may terminate this policy on any premium due date by giving written notice to the Sponsor at least 180 days in advance if:

    a. the number of Employees insured is fewer than 10; or

    b. less than 100.00% of all the Employees eligible for any non-contributory insurance are insured for it; or

    c. less than 75.00% of all the Employees eligible for any contributory insurance are insured for it; or

    d. the Sponsor fails:

        i. to furnish promptly any information which Liberty may reasonably require; or
        ii. to perform any other obligations pertaining to this policy.

4. Liberty may terminate this policy or any coverage(s) afforded hereunder and for any class of covered Employees on any premium due date after it has been in force for 12 months. Liberty will provide written notice of such termination to the Sponsor at least 180 days before the termination is effective.

5. Termination may take effect on an earlier date if agreed to by the Sponsor and Liberty.

# SECTION 7 - GENERAL PROVISIONS

**Assignment**

No assignment of any present or future right or benefit under this policy will be allowed.

**Complete Contract - Policy Changes**

1. This policy is the entire contract. It consists of:

   a. all of the pages; and
   b. the attached signed Application of the Sponsor; and
   c. if contributory each Employee's signed application for insurance.

2. This policy may be changed in whole or in part. Only an officer of Liberty can approve a change. The approval must be in writing and endorsed on or attached to this policy.

3. No other person, including an agent, may change this policy or waive any part of it.

**Conformity with State Statutes**

Any provision of this policy which, on its effective date, is in conflict with the statutes of the governing jurisdiction of this policy is hereby amended to conform to the minimum requirements of such statute.

**Employee's Certificate**

Liberty will provide a Certificate to the Sponsor for delivery to Covered Persons. It will state:

1. the name of the insurance company and the policy number;
2. a description of the insurance provided;
3. the method used to determine the amount of benefits;
4. to whom benefits are payable;
5. limitations or reductions that may apply;
6. the circumstances under which insurance terminates; and
7. the rights of the Covered Person upon termination of this policy.

If the terms of a Certificate and this policy differ, this policy will govern.

**Examination**

Liberty, at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty. This right may be used as often as reasonably required.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Furnishing of Information - Access to Records**

1. The Sponsor will furnish at regular intervals to Liberty:

   a. information relative to Employees:

      i. who qualify to become insured;
      ii. whose amounts of insurance change; and/or
      iii. whose insurance terminates.

   b. any other information about this policy that may be reasonably required.

   The Sponsor's records which, in the opinion of Liberty, have a bearing on the insurance will be opened for inspection at any reasonable time.

2. Clerical error or omission will not:

   a. deprive an Employee of insurance;
   b. affect an Employee's Amount of Insurance; or
   c. effect or continue an Employee's insurance which otherwise would not be in force.

**Interpretation of the Policy**

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

**Incontestability**

The validity of this policy shall not be contested, except for non-payment of premiums, after it has been in force for two years from the date of issue. The validity of this policy shall not be contested on the basis of a statement made relating to insurability by any person covered under this policy after such insurance has been in force for two years during such person's lifetime, and shall not be contested unless the statement is contained in a written instrument signed by the person making such statement.

**Legal Proceedings**

A claimant or the claimant's authorized representative cannot start any legal action:

1. until 60 days after Proof of claim has been given; or

2. more than one year after the time Proof of claim is required.

**Misstatement of Age**

If a Covered Person's age has been misstated, an equitable adjustment will be made in the premium. If the amount of the benefit is dependent upon an Employee's age, the amount of the benefit will be the amount an Employee would have been entitled to if his correct age were known.

A refund of premium will not be made for a period more than 12 months before the date Liberty is advised of the error.

**Notice and Proof of Claim**

1. **Notice**

   a. Notice of claim must be given to Liberty within 30 days of the date of the loss on which the claim is based. If that is not possible, Liberty must be notified as soon as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to Liberty.

   b. When written notice of claim is applicable and has been received by Liberty, the Covered Person will be sent claim forms. If the forms are not received within 15 days after written notice of claim is sent, the Covered Person can send to Liberty written Proof of claim without waiting for the forms.

2. **Proof**

   a. Satisfactory Proof of loss must be given to Liberty no later than 30 days after the end of the Elimination Period.

   b. Failure to furnish such Proof within such time shall not invalidate or reduce any claim if it was not reasonably possible to furnish such Proof within such time. Such Proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required.

   c. Proof of continued loss, continued Disability or Partial Disability, when applicable, and Regular Attendance of a Physician must be given to Liberty within 30 days of the request for such Proof.

Liberty reserves the right to determine if the Covered Person's Proof of loss is satisfactory.

**Payment of Claims**

The benefit is payable to the Covered Person. But, if a benefit is payable to a Covered Person's estate, a Covered Person who is a minor, or who is not competent, Liberty has the right to pay up to $2,000 to any of the Covered Person's relatives or any other person whom Liberty considers entitled thereto by reason of having incurred expense for the maintenance, medical attendance or burial of the Covered Person. If Liberty in good faith pays the benefit in such a manner, any such payment shall fulfill Liberty's responsibility for the amount paid.

**Right of Recovery**

Liberty has the right to recover any overpayment of benefits caused by, but not limited to, the following:

1. fraud;
2. any error made by Liberty in processing a claim; or
3. the Covered Person's receipt of any Other Income Benefits.

Liberty may recover an overpayment by, but not limited to, the following:

1. requesting a lump sum payment of the overpaid amount;
2. reducing any benefits payable under this policy;
3. taking any appropriate collection activity available including any legal action needed; and
4. placing a lien, if not prohibited by law, in the amount of the overpayment on the proceeds of any Other Income Benefits, whether on a periodic or lump sum basis.

It is required that full reimbursement be made to Liberty.

**Statements**

In the absence of fraud, all statements made in any application are considered representations and not warranties (absolute guarantees). No representation by:

1. the Sponsor in applying for this policy will make it void unless the representation is contained in the signed Application; or

2. any Employee in enrolling for insurance under this policy will be used to reduce or deny a claim unless a copy of the Enrollment Form, signed by the Employee if required, is or has been given to the Employee.

**Subrogation and Reimbursement**

When a Covered Person's Injury or Sickness appears to be someone else's fault, benefits otherwise payable under this policy for loss of time as a result of that Injury or Sickness will not be paid unless the Covered Person or his legal representative agree(s):

1. to repay Liberty for such benefits to the extent they are for losses for which compensation is paid to the Covered Person by or on behalf of the person at fault;

2. to allow Liberty a lien on such compensation and to hold such compensation in trust for Liberty; and

3. to execute and give to Liberty any instruments needed to secure the rights under 1. and 2. above.

Further, when Liberty has paid benefits to or on behalf of the injured Covered Person, Liberty will be subrogated to all rights of recovery that the Covered Person has against the person at fault. These subrogation rights will extend only to recovery of the amount Liberty has paid, but only when the Covered Person has been fully reimbursed for the expenses the Covered Person has paid. The Covered Person must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to Liberty.

**Workers' Compensation**

This policy and the coverages provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

# SECTION 8 - PREMIUMS

**Premium Rates**

Liberty has set the premiums that apply to the coverage(s) provided under this policy. Those premiums are shown in a notice given to the Sponsor with or prior to delivery of this policy.

A change in the initial premium rate(s) will not take effect within the first 36 months except that Liberty may change premium rates at any time for reasons which affect the risk assumed, including those reasons shown below:

1. a change occurs in the policy design;
2. a division, subsidiary or Associated Company is added to or deleted from this policy;
3. when the number of Covered Persons changes by 15.00% or more from the number insured on this policy's effective date; or
4. a change in existing law which affects this policy.

No premium may be changed unless Liberty notifies the Sponsor at least 60 days in advance. Premium changes may take effect on an earlier date when both Liberty and the Sponsor agree.

**Payment of Premiums**

1. All premiums due under this policy, including adjustments, if any, are payable by the Sponsor on or before their due dates at Liberty's Administrative Office, or to Liberty's agent. The due dates are specified on the first page of this policy.
2. All payments made to or by Liberty shall be in United States dollars.
3. If premiums are payable on a monthly basis, premiums for additional or increased insurance becoming effective during a policy month will be charged from the next premium due date.
4. The premium charge for insurance terminated during a policy month will cease at the end of the policy month in which such insurance terminates. This manner of charging premium is for accounting purposes only. It will not extend insurance coverage beyond a date it would have otherwise terminated as shown in the "Termination of a Covered Person's Insurance" provision of this policy.
5. If premiums are payable on other than a monthly basis, premiums for additional, increased, reduced or terminated insurance will cause a prorated adjustment on the next premium due date.
6. Except for fraud and premium adjustments, refunds of premiums or charges will be made only for:
    1. the current policy year; and
    2. the immediately preceding policy year.

# SECTION 8 - PREMIUMS
(Continued)

**Grace Period**

This is the 75 days following a premium due date, other than the first, during which premium payment may be made. During the grace period this policy shall continue in force, unless the Sponsor has given Liberty written notice 31 days in advance of discontinuance of this policy.

**Waiver of Premium**

Premium payments for a Covered Person are waived during any period for which benefits are payable. If coverage is to be continued, premium payments must be resumed following a period during which they were waived.

# AMENDMENT NO. 1

It is agreed the following changes are hereby made to this policy: GF3-840-444752-01

| Changes | Additions | Deletions |
| --- | --- | --- |
| Revised the Grace Period to 75 days | Form ADOP-PRE-2 R (1) | Form ADOP-PRE-2 |

The effective date of this change is October 1, 2016.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 25th day of October, 2016.

Issued to and Accepted by:

Quad/Graphics, Inc
**Sponsor**

By ______________________________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

# AMENDMENT NO. 2

It is agreed the following changes are hereby made to this policy: GF3-840-444752-01

| Changes | Additions | Deletions |
|---|---|---|
| Revised Own Occupation to Own Job and Any Occupation to Any Job throughout the policy | Form ADOP-SCH-3.2 R (1) | Form ADOP-SCH-3 |
| | Form ADOP-DEF-2.12 R (1) | Form ADOP-DEF-2 |
| | Form ADOP-DEF-3.12 R (1) | Form ADOP-DEF-3 |
| | Form ADOP-DEF-6.4 R (1) | Form ADOP-DEF-6 |
| | Form ADOP-DEF-7.8 R (1) | Form ADOP-DEF-7 |
| | Form ADOP-DEF-8.10 R (1) | Form ADOP-DEF-8 |
| | Form ADOP-LTD-5.6 R (1) | Form ADOP-LTD-5 |
| | Form ADOP-LTD-26.11 R (1) | Form ADOP-LTD-26 |
| | Form ADOP-LTD-27.4 R (1) | Form ADOP-LTD-27 |

The effective date of this change is June 1, 2016.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 10th day of November, 2016.

Issued to and Accepted by:

Quad/Graphics, Inc
**Sponsor**

By ________________________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

# AMENDMENT NO. 3

It is agreed the following changes are hereby made to this policy: GF3-840-444752-01

| Changes | Additions | Deletions |
|---|---|---|
| Addition of Family Care Credit Benefit | Form ADOP-LTD-9.5 R (1) | Form ADOP-LTD-9 |

The effective date of this change is May 5, 2017.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 18th day of May, 2017.

Issued to and Accepted by:

Quad/Graphics, Inc
**Sponsor**

By ________________________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

# AMENDMENT NO. 4

It is agreed the following changes are hereby made to this policy: GF3-840-444752-01

| Changes | Additions | Deletions |
|---|---|---|
| Changed the definition of Eligible Survivor in Section 2 | Form ADOP-DEF-4 R (1) | Form ADOP-DEF-4 |

The effective date of this change is November 1, 2017.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 5th day of February, 2018.

Issued to and Accepted by:

Quad/Graphics, Inc
**Sponsor**

By ______________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

VOCATIONAL ECONOMICS INC.

NATIONAL HEADQUARTERS 800-227-0198

401 WEST MAIN STREET, SUITE 710, LOUISVILLE, KY 40202 502-589-0995

WWW.VOCECON.COM

June 18, 2024

***<u>VIA ELECTRONIC MAIL</u>***
Mr. Christopher Koester
Attorney at Law
Taylor Law Offices
122 East Washington Ave
P.O. Box 668
Effingham, IL 62401-0668

Re: Benjamin Shelton Long-Term Disability Determination

Dear Mr. Koester:

Upon your request, I reviewed the following information regarding your client, Benjamin Shelton.

- Letter from Lincoln Financial Group dated March 18, 2024, summarizing the long-term disability determination re: Benjamin Shelton;
- Letter from Lincoln Financial Group dated March 4, 2024, including medical review by Charles W. Brock, MD.

Dt. Brock found the following restrictions were reasonable for Mr. Shelton:

• *Lift, push, pull, lift and carry occasionally, and not to exceed 10 lbs.*
• *Walking: 30 minutes at a time, for a total of 4 hours in a workday.*
• *Sitting: 30 minutes at a time, for a total of 4 hours in a workday.*
• *Standing: 30 minutes at a time, for a total of 4 hours in a workday*
• *Stoop/kneel/crouch/bend/crawl only frequently.*
• *Fine finge1~ grip, and grasp occasionally.*
• *Reach at, above, and below shoulder occasionally.*

The letter mentioned a transferable skills analysis that indicated Mr. Shelton was able to perform the work of a Surveillance System Monitor. That work is defined in the U.S. Department of Labor's Dictionary of Occupational Titles (DOT) as unskilled work (SVP 2) of a sedentary nature. Skills acquired in previous work cannot be transferred to UNSKILLED work. No other details of the Transferable Skills Analysis were provided by Lincoln Financial group.

**EXHIBIT B**

Surveillance System Monitor is one of 12,000+ occupational titles in the DOT that was last updated in 1991.

A labor market study regarding the availability of work as a Surveillance System Monitor was conducted in 2016 and the findings were published by the American Board of Vocational Experts in the *Journal of Forensic Vocational Analysis, Vol. 16, No. 2, Winter 2016*.[1]The article Surveillance System Monitors in the Work Force Kincaid Vocational and Rehabilitation Services by Dan Wolstein summarized why the occupation of Surveillance System Monitor as defined in the DOT is obsolete. The study found the duties of Surveillance System monitors in today's labor market had physical demands greater than that of sedentary work. The study also found that the work is performed at the semiskilled level in today's labor market. The author found "this occupation has changed substantially and should be used with caution when recommended for return-to-work purposes."

The occupational title of Surveillance System Monitor is obsolete and no longer exists in the labor market at the same skill level and physical demand level it did when the DOT was last updated in 1991. As a Social Security vocational expert since 2006, I no longer use it as an example of an occupation that can be performed by individuals who are limited to unskilled sedentary work with no more than occasional handling.

Please advise if further information is required.

Sincerely,
VOCATIONAL ECONOMICS, INC.

For the firm

Linda L. Jones, MRC, MBA, MPA, CRC
Senior Vocational-Economic Analyst

/llj

Attachments: ABVE Article
Linda Jones CV

[1] Article attached.

*Journal of Forensic Vocational Analysis, Vol. 16, No 2. Winter 2016*
Printed in the U.S.A. All rights reserved. © 2016 American Board of Vocational Experts

# Surveillance-system Monitors in the Work Force Kincaid Vocational and Rehabilitation Services

**Dan Wolstein**
*Associate at Kincaid Vocational and Rehabilitation Services.*

***Abstract.*** *A labor market survey was conducted to assess the responsibilities and skills of Surveillance-system Monitors as they exist in the current labor market. A tri-modal approach was taken. First, 58 job vacancy advertisements were reviewed to analyze the physical requirements of Surveillance-system Monitors as they exist in the labor market today, along with other factors that contribute to the skill-level of this position. Second, the position of Transportation Security Officer was reviewed via the job vacancy advertisement and job description video (accessed through the Transportation Security Administration website). Third, employers of Surveillance-system Monitors, and employees currently performing work as a Surveillance-system Monitor, were contacted at various establishments including colleges, hotels, and malls in the New Jersey and Texas State areas. The results indicate that the physical and cognitive requirements of Surveillance-system Monitors have changed significantly since the last major revision of the Dictionary of Occupational Titles in 1991. The essential functions of Surveillance-system Monitors now require use of others skills, longer training, higher aptitudes, and greater physical demands. The research conducted for this study returned a 0% prevalence of Surveillance-system Monitors as it is conventionally described in the* Dictionary of Occupational Titles.

The labor market is ever changing; new occupations are emerging, older ones are being eliminated, and many are evolving to meet the newly developing needs of employers. Despite the changing needs of employer, and the respective reengineering of jobs, the *Dictionary of Occupational Titles* was last updated in 1991 and, due to the costly expenses associated with maintenance and upkeep of a current occupational database, may not have the most up to date information on specific occupations that are more subject to change. Extensive research suggests that specific occupations exist, but have changed from the original description in the Dictionary of Occupational Titles (Duncan, 2014). Having up to date knowledge and facts for vocational analysis and vocational expertise is important (e.g., Ehlert & Berg, 2010). One occupation that has been altered greatly is Surveillance-system Monitor (D.O.T.: 379.367-010).

The U.S. Department of Labor (1991) conducted job analyses in eight different locations with multiple employers. The methodology was such that job analyses were conducted to observe workers in their respective milieus, interviews were held with employers to discuss job requirements, and job descriptions were reviewed. Eventually, in a later update, average levels were compiled to form the worker trait profiles for occupations (Colvin, 1972 as cited in McCroskey, 2015). Using said methodology, the United States Department of Labor published the following information for Surveillance-system Monitors:

> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

Additional information includes:

| | |
|---|---|
| Reasoning | Low Average |
| Mathematics | Very Low |
| Language | Low Average |
| General Learning | Average |
| Verbal | Average |
| Numerical | Below Average |
| Spatial Perception | Below Average |
| Form Perception | Below Average |
| Clerical Perception | Below Average |
| Motor Coordination | Below Average |
| Finger Dexterity | Below Average |
| Manual Dexterity | Below Average |
| Eye/Hand/Foot Coordination | Minimal or None |
| Color Discrimination | Minimal or None[1] |

Formerly, this occupation required a sedentary physical capacity because no lifting of over 10 lbs. was required, and the worker was stationary at a desk location. Other pertinent information includes: a specific vocational preparation of two (30 days of training), a reasoning and language ability of three (low average), a mathematics ability of one (very low), and the ability to hear, talk, utilize near sighted acuity, and work in quiet environmental conditions (U.S. Department of Labor, 1991). The occupation title is classified under the government services industry; however, the results of this research indicate that Surveillance-system Monitors exist in private industries as well, including the retail industry, the hotel and accommodations industry, and the education industry.

Although Surveillance-system Monitors once existed in the labor market with the description found in the *Dictionary of Occupational Titles*, the changing needs of employers, the competitive nature of the labor market, and the rapid advancement of technology have all contributed to a reorganization of Surveillance-system Monitor duties. This is particularly important for forensic vocational consultants, who are responsible for rendering their professional opinions about the labor market in different court systems including civil litigation matters and Social Security Disability Insurance determinations.

For vocational experts, accurate testimony is a cardinal concern, not just for the integrity of the court system, but for professional reputation as well. The onus falls on vocational experts to have knowledge of, and testify to, the most current labor market trends and requirements of occupations. The U.S. Department of Labor (1991) corroborates this notion and states: "DOT users demanding specific job requirements should supplement this data [information from the *Dictionary of Occupational Titles*] with local information detailing jobs within their community." Therefore, the purpose of this research is to conduct a labor market survey and provide vocational experts with the most accurate representation of Surveillance-system Monitors as they exist in the workforce today.

## Methodology

The methodology used for this research employed a three-pronged approach. There is a great wealth of data and ability to analyze occupations simply based on the requirements listed in job vacancies. It would be a significant oversight of this study if a conclusion was made based on labor market research of employers and employees involved with Surveillance-system Monitors without drawing upon objective data posted in job vacancies (what motive would an employer have to inaccurately describe the requirements of a job). Additionally, while there were approximately ten employers and employees with matters involving Surveillance-system Monitors, the employees and employers contacted were part of large corporations and likely representative of the requirements of similar establishments and comparable job positions throughout the nation. (A great deal of other establishments were contacted, but were unwilling to provide information due to the concerns of maintaining confidential security procedures.) The job position of Transportation Security Officers employed by the Transportation Security Administration was analyzed too.

### Review of Job Vacancy Advertisements

A labor market survey was conducted for four major labor market state areas: New York, Connecticut, and New Jersey (tri-State area), California, Florida, and Texas State areas. These labor markets are four major sources of employment in the national market. Job search engines were frequented from November 2014 to January 2015 using keywords to locate jobs requiring the monitoring of surveillance equipment. The keywords included: surveillance, closed-circuit television, CCTV, and monitor. The majority of job positions that were returned in the results included Loss Pre-

1 Not present for physical activities climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, feeling, tasting, far acuity, depth perception, accommodation, color vision, or field vision. Frequent hearing and talking.

vention Agent and Security Officer, or variations thereof. Job vacancies that were returned that did not contain surveillance or camera monitoring were omitted from the job advertisements analyzed for this study. All of the job vacancy advertisements were saved electronically as portable document files (PDFs) for later review.

Over the course of six months, from November 2014 to January 2015, fifty-eight positions were located within the labor market areas noted above. The jobs were reviewed to ensure that monitoring of surveillance equipment was an essential function of the job advertisement. Analysis was done as to whether the job vacancies contained comparable duties to Surveillance-system Monitors as described in the Dictionary of Occupational Titles. The job advertisements were categorized into one of three groups: meets the specifications for conventional Surveillance-system Monitors; violates the conventional job description on one basis (i.e., physical requirements exceeding 10 lbs.); violates the conventional job description on more than one basis (i.e., physical requirements exceeding 10 lbs., and writing reports or maintaining paperwork logs).

### Review of Transportation Security Officer Duties

Job vacancies provided by the Transportation Security Administration were analyzed because one duty – the monitoring of the baggage-screening devices – is inclusive of the duties of Surveillance-system Monitors. The Transportation Security Administration is likely one of the largest employers of Surveillance-system Monitors although they are referred to as Transportation Security Officers.

The information contained in the job vacancy advertisement was reviewed to determine if there are any requirements exceeding that of Surveillance-system Monitors as they are described in the Dictionary of Occupational Titles. A video was also provided on the website, describing the job duties by those who were, at the time of the filming, currently employed as Transportation Security Officers. The information from the video was reviewed, along with the information contained in the job advertisement.

### Labor Market Survey of Current Employers and Employees

A labor market survey was also done by contacting establishments that had employees monitoring surveillance systems. Supervisors of Surveillance-system Monitors or employees performing duties of Surveillance-system Monitors were contacted. Participants were interviewed to discuss the job requirements, including amount of training for the job and the exertional demands of the job, along with a general description of the job duties. This researcher attempted to make contact with at least one establishment in several different industries. The following establishments supplied information used for this study: two malls in the northern New Jersey area; a college in the northern New Jersey area; a prison in the northern New Jersey area; a hotel and casino in the Atlantic City, New Jersey State area; two hotels in the San Antonio, Texas, area; a Security Manager of multiple hotels in the San Antonio, Texas, area; a larger vocational agency in the New Jersey State area; and a high-rise commercial building in the New York, New York area. The descriptions obtained from the participants were analyzed to determine whether the duties constituted that of Surveillance-system Monitors as conventionally described by the Dictionary of Occupational Titles, or whether the duties have changed significantly, constituting a different set of job demands and job duties.

### Limitations

The methodology employed by the United States Department of Labor was developed to aggregate a tremendous amount of data to yield worker profiles and job requirements for all occupations. That is not the purpose of this research and, therefore, a different methodology was utilized and information was not obtained for each of the worker traits. The purpose of this research is to find a representative sample of job vacancies for vocational experts to render more informed opinions. This study does not follow the methodological procedures for job analysis that the United States Department of Labor conducted. The methodology utilized for this study was constructed specifically to understand whether the job duties of Surveillance-system Monitors in the current workforce have changed or evolved over time, specifically since the last update of the Dictionary of Occupational Titles in 1991. Budget constraints limit this researcher from doing job-site analyses to observe specific levels of the worker traits, while an abundance of information is available via job vacancy advertisements, research, and qualitative information from employers of Surveillance-system Monitors to meet the objectives of this research.

Lastly, no standard error can be computed, in the realm of statistical assessments, as only frequencies were utilized for analysis of the data used in this study.

## Results

### Job Vacancy Advertisements

In summary, 58 position advertisements were reviewed. All 58 positions violated the duties of Surveillance-system Monitors as described by the Dictionary of Occupational Titles. Nine of the jobs had one duty only that exceeded the standards of sedentary unskilled work, while 49 of the jobs had multiple duties exceeding sedentary un-

skilled duties. Twenty-eight of the job listings exceeded sedentary duties explicitly in the advertisement, calling for lifting of 20 to 200 lbs., (most of which were 20 to 55 lbs. of physical lifting, and only three of which called for lifting of 100 to 200 lbs.). Twenty-seven of the occupations explicitly stated walking, patrolling, or climbing duties. Twenty-two of the jobs listed duties of responding to emergencies or apprehending shoplifters. Responding to emergencies or apprehending were combined into one category because the physical requirements of this responsibility can change from situation to situation. (For example, apprehending an individual that weighs 120 lbs. versus an individual that weighs 200 lbs. is going to necessitate different levels of physical exertion.) Fourteen of the jobs had clerical duties including paperwork, logging activities, writing reports, and matters of supplying or checking identification, which likely exceed unskilled duties. Finally, five of the jobs explicitly stated Associate's Degree required or Bachelor's Degree preferred. All of the jobs either stated monitoring CCTVs, surveilling CCTVs, observing CCTVs, operating CCTVs, or knowledge of CCTVs/camera systems. Employers of the job advertisements reviewed include the Gap, Marshalls, Family Dollar, CVS, Kohl's, Wyndham Hotels, Sears, Home Depot, Lowe's, Neiman Marcus, Macy's, and lesser known hotels. For a summary, see Table 1.

**Table 1.** Frequencies of Duties Exceeding Sedentary Unskilled Work

| State | No. of Jobs | One Duty | Multiple | Physical | Walking | Responding | Clerical |
|---|---|---|---|---|---|---|---|
| California | 11 | 2 | 9 | 4 (20-35 lbs.) | 3 | 3 | 5 |
| New Jersey | 10 | 3 | 7 | 4 (20-30 lbs.) | 4 | 4 | 2 |
| Connecticut | 5 | 0 | 5 | 3 (20-200 lbs.) | 3 | 3 | 1 |
| New York | 4 | 2 | 2 | 2 (30-55 lbs.) | 1 | 2 | 1 |
| Texas | 10 | 0 | 10 | 5 (25-100 lbs.) | 5 | 5 | 5 |
| Florida | 18 | 2 | 16 | 10 (20-200 lbs.) | 11 | 5 | 5 |
| Total | 58 | 9 | 49 | 28 | 27 | 22 | 19 |

*Note.* [a] The category for clerical includes educational requirements exceeding unskilled levels. For this research, customer service duties, writing reports, or logging information was considered higher than a specific vocational training of two. [b] The categories of one duty and multiple [duties] were intended to encapsulate whether the job vacancy contained one issue that exceeded the requirements of sedentary unskilled work, or had multiple duties exceeding sedentary unskilled work.

The job vacancy duties invariably exceeded the job duties of Surveillance-system Monitor as described in the *Dictionary of Occupational Titles*. For the job advertisements reviewed for this research, it is clear that the categories of sedentary physical exertion, and unskilled specific vocational training, do not adequately encapsulate the duties of Surveillance-system Monitors.

In regard to the training and intellectual requirements of Surveillance-system Monitors, the job openings reviewed asked for applicants to be knowledgeable in use of computer systems, report writing, and computer software such as Microsoft Office. Several of the positions called for Associate's Degrees, with preferences for Bachelor's Degrees, constituting skilled work. Job positions at the Transportation Security Administration were also reviewed.

## Transportation Security Officer Duties

In order to analyze the duties of the Surveillance-system Monitors employed by the Transportation Security Administration, the job position responsible for these duties needed to be determined. Upon review of the website hosting job openings for the Transportation Security Administration, the entry-level job title was found for Transportation Security Officer. The job vacancy advertisement specifically listed duties corresponding to viewing of the baggage screening

devices. The job vacancy advertisement for Transportation Security Officers states the following:

> ... a job related medical evaluation that includes a vision exam, hearing exam, and adequate joint mobility exam (in part to determine the physical potential to repeatedly lift and/or carry up to 70 pounds, to stand between one to four hours without a break, and to walk up to two miles during a shift).
>
> The advertisement also lists the following duties:
>
> Operating screening equipment to identify dangerous objects in baggage, cargo and on passengers, and preventing those objects from being transported onto aircraft. Performing searches, to include hand-wand and pat-down searches. Controlling terminal entry and exit points. Interacting with the public, giving directions and responding to inquiries. Maintaining focus and awareness while working in a stressful environment which includes noise from alarms, machinery and people, crowd distractions, time pressure, and disruptive and angry passengers, in order to preserve the professional ability to identify and locate potentially life threatening or mass destruction devices, and to make effective decisions in both crisis and routine situations.[1]

The job description indicates that Transportation Security Officers must be able to lift and/or carry up to 70 lbs. to stand between one to four hours without a break, and to walk up to two miles during a shift. To confirm that these are the individuals performing Surveillance-system Monitor duties, the first bullet point of the job duties states that viewing of screening equipment is an important aspect of Transportation Security Officers. From the job vacancy advertisement, it is clear that the duties of individuals performing Surveillance-system Monitor duties are not performing work that is sedentary or unskilled. Lifting of up to 70 lbs. would be categorized by the Dictionary of Occupational Titles as heavy work.

The Transportation Security Administration provides a video regarding the duties of Transportation Security Officers. It states:

You're working in a fast-paced, high stress environment. There's multiple distractions, loud noises, irate passengers.

You have to be able to concentrate on your job, and deal with all these distractions at the same time. There's a lot that goes into it, that goes into this job…There's lot of standing, lots of walking.[2]

Based on the information provided, it again becomes clear that individuals performing Surveillance-system Monitor duties are no longer performing work that matches the description of sedentary or unskilled.

## Labor Market Survey of Surveillance-system Monitor Employers and Employees

Surveillance-system Monitors in New York City at a high-rise commercial establishment who were stationed at the front desk were contacted. One individual was willing to answer some questions and provide information about his job duties. He related that the employees of this establishment were required to stand at a desk all day, with no option for sitting. The individuals performing this work were surveilling monitors while also identifying and clearing individuals to pass the security checkpoint. These Surveillance-system Monitors were required to stand for their full shift of up to eight hours.

A hotel in San Antonio, Texas, was also contacted. This establishment had a security system in place that required employees to monitor the camera systems. The Security Manager of this establishment was willing to provide information. He related that their Surveillance-system Monitors were required to rotate positions, switching from monitoring the camera systems to patrolling and checking in at specific checkpoints using their assigned keycards. The Security Manager estimated that walking of 2-3 miles per day was required of their Surveillance-system Monitors. Fortunately, the Security Manager had also worked at three malls in the San Antonio, Texas, area and was willing to provide information about those establishments as well. He stated that the Surveillance-system Monitors employed by the malls also had rotating duties. They would rotate from monitoring camera systems, to patrolling the premises; they were also required to carry handcuffs because occasional apprehension of shoplifters was an essential part of their job position.

The Security Supervisor in the Texas state area described the duties of Surveillance-system Monitors that he employs. He reported that all of his employees are required to do a significant amount of walking, with training of up to 19 weeks. He was unable to give more information.

The Prison Lieutenant in New Jersey stated that the Surveillance-system Monitors at the prison he works at

1 *https://www.usajobs.gov/GetJob/ViewDetails/400106900*

2 *http://www.realisticjobpreview.net/tsa_final.htm*

were mostly skilled individuals and had at least a high school diploma. These Surveillance-system Monitors were also required to rotate positions from monitoring camera systems to patrolling inmate locations. The Security Guards would also be required to subdue inmates if the need ever arose.

A college in the northern New Jersey area was contacted. The Security Manager at this college indicated that the majority of his employees were retired police officers. These individuals were required to patrol campus for up to 2 hours per day, and during different shifts would be the individual monitoring the surveillance system as well. An additional demand of the Officers at this campus was to escort athletes to and from different locations during inclement weather conditions, as well as perform customer service duties.

A vocational counseling establishment was contacted in the New Jersey State area. The establishment also had a Surveillance System in place. The individuals monitoring the surveillance system were Security Guards. The Security Guard stated that, at the very least, a SORA card (Security Officer Registration Act) was required to get employed at this establishment. The Security Guard stated that he was also required to do some patrolling, identifying visitors and giving them badges at the front desk, and responding to incidents if they occur.

Another hotel was contacted in the San Antonio, Texas, area. This hotel required that the Security Officers monitoring the camera system switch positions every 35 minutes. When not surveilling camera footage, the Security Guards were patrolling the premises. The contact indicated that a significant part of the Security Officer position entails dealing with customers.

Two malls in the Northern New Jersey area were contacted to ask about the job duties of the Surveillance-system Monitors. For the first mall, a Security Manager was contacted. He indicated that, at the very least, a SORA card was required to be considered for the position. The Security Manager stated that the Security Officers are required to patrol for anywhere from four to eight hours (the duration of their shift). He was not able to give any additional information. At the second mall, a Security Guard was contacted. He stated that the Security Guards at this establishment were responsible for monitoring the surveillance footage, but were also responsible for patrolling and responding to any emergencies.

Lastly, a hotel with a casino attached was contacted in the Atlantic City, New Jersey State area. The individual spoken with indicated that the Security Guards at this establishment were expected to perform different duties on different shifts, ranging from observing surveillance footage, to standing for 12 hour shifts with no option for sitting. If patrolling the casino area, any emergent situation would also be within their responsibilities. In other words, if an individual attempted to leave the casino with unearned chips, the Security Officers would be responsible for apprehending that individual.

The results of the labor market survey where employers and employees were contacted also invariably pointed towards a changed set of job duties for Surveillance-system Monitors. The physical demands and level of skilled and educational training have changed significantly. The Surveillance-system Monitors were required to do a significant amount of physical labor and skilled job duties.

## Discussion

The research conducted clearly shows that the responsibilities of Surveillance-system Monitors have changed significantly since the last revision of the Dictionary of Occupational Titles was revised in 1991. The changes have altered the nature of Surveillance-system Monitors duties at the most fundamental level.

Primarily, the duties of Surveillance-system Monitors as they exist in the current labor market no longer require exertional duties at the sedentary level alone. The vast majority of job openings called for, at the very least, patrolling and walking to a significant degree. At the most, the job openings reviewed called for lifting of up to 200 lbs., or responding to emergencies, such as apprehending shoplifters, which can require restraining of all types of individuals (likely exceeding weight limits of 200 lbs.) The nature of the duties described above is much more closely associated with that of Merchant Patroller (D.O.T.: 372.667-038), with the addition of being required to surveil closed-circuit television systems. Merchant Patrollers are categorized into light level job duties with a specific vocational preparation of 3, or semi-skilled work. It is likely that having to apprehend shoplifters would constitute duties that exceed light duty, too.

As conventionally described in the Dictionary of Occupational Titles, the duties of Surveillance-system Monitors would be a congruent fit for people experiencing some form of a disability, especially a physical disability. However, since the job title has changed since the 1991 revision of the Dictionary of Occupational Titles, it may no longer be a congruent fit for individuals with disabilities, depending upon the implications of the specific disability. This occupation has

changed substantially, and should be used with caution when recommended for return-to-work purposes.

## Conclusion

It is apparent that many changes have occurred in the domain of responsibilities for Surveillance-system Monitors. Some job titles are more subject to change, which becomes problematic because the latest revision of the Dictionary of Occupational Titles was in 1991. By and large, the Dictionary of Occupational Titles is an exceedingly valuable tool in analyzing an individual's employment history. For certain occupations, updating the job description can give a more accurate overview of the job duties.

The position of Surveillance-system Monitor no longer requires the same physical capacities, levels of general educational development, temperament or ability to negotiate the same environmental conditions. The job responsibilities of a Surveillance-system Monitor in the current labor market are combined with the responsibilities of other jobs, including Loss Prevention Agent and Security Officer, based on the information reviewed for this study. These responsibilities alter the physical capacities, aptitudes, temperament, environmental conditions and general educational developments required by the traditional job title of Surveillance-system Monitor. As conventionally described in the Dictionary of Occupational Titles, Surveillance-system Monitor could be cited as a sedentary unskilled job position for which an individual can return to substantial gainful activities. Based on this research, however, there is no evidence that the Surveillance-system Monitor occupation exists in the U.S. economy as sedentary and unskilled, and as classified in the last edition of the Dictionary of Occupational Titles.

## References


Duncan, T. (2014). Labor market study. Furniture rental clerk, DOT: 295.357-018 SVP:2 strength: light Counter Clerk, DOT: 249.366-010 SVP:2 strength: light. *Journal of Forensic Vocational Analysis, 15*(2), 29-33.

Ehlert, S. S., & Berg, J. (2010). Evidence-based vocational analysis: a solution to the "soft science" problem. *Journal of Forensic Vocational Analysis, 13*(1), 23-30.

McCroskey, B. VDARE 2015. Available from *http://www.vocational.org/*

U.S. Dept. of Labor. Bureau of Statistics. (1991). Dictionary of Occupational Titles (4th ed.). Washington, DC: U.S. Government Printing Office.

U.S.A Jobs. (n.d.). Retrieved April 7, 2015 from: *https://www.usajobs.gov/GetJob/ ViewDetails/400106900*


## Author Note


Dan Wolstein is an Associate at Kincaid Vocational and Rehabilitation Services.

Correspondence concerning this article should be addressed to Dan Wolstein, 1 University Plaza, Suite 510, Hackensack, New Jersey 07601.
Contact: *Dan@Kincaidvocational.com*